IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDWIN ALTNOR, et al.,            :    CIVIL ACTION
                                 :    No. 14-7043
            Plaintiffs,          :
                                 :
       v.                        :
                                 :
PREFERRED FREEZER SERVICES, INC., :
                                 :
            Defendant.           :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        July 18, 2016


**Table of Contents**

I. BACKGROUND ............................................... 2

II. THE PROPOSED SETTLEMENT AGREEMENT ......................... 6

  A.  The Proposed Settlement Class and Collective ........... 6

  B.  The Proposed Settlement Agreement's Terms .............. 7

III. DISCUSSION ............................................. 10

  A. State Law Class Certification under Rule 23 ............. 11

    1. Rule 23(a) Criteria .................................. 12

    2. Rule 23(b) Criteria .................................. 15

  B. FLSA Collective Certification ........................... 18

  C. The Fairness of the Proposed Settlement ................. 22

    1. Class Action Settlement .............................. 22

    2. Collective Action Settlement ......................... 29

  D. Attorneys' Fees ......................................... 33

  E. Incentive Award ......................................... 45

IV. CONCLUSION .............................................. 54

1

Plaintiffs Edwin Altnor and Christina Oyola ("Named Plaintiffs"), on behalf of a putative class, and Defendant Preferred Freezer Services, Inc. ("Defendant") have negotiated and agreed to a collective and class settlement that will resolve Plaintiffs' claims under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. ("FLSA"); the Pennsylvania Minimum Wage Act, 43 Pa. Cons. Stat. § 333.101 et seq. ("MWA"); and the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons. Stat. § 260.1 et seq. ("WPCL").

The Court previously granted Plaintiffs' unopposed motion for preliminary approval, and Plaintiffs now seek final approval of the class and collective action settlement. For the reasons that follow, the Court will grant in part and deny in part the motion for final approval.

I.     BACKGROUND

The Named Plaintiffs are former employees of Defendant, a refrigerated warehouse company. On December 11, 2014, the Named Plaintiffs filed a Class/Collective Action Complaint against Defendant, alleging that Defendant failed to pay overtime wages for missed and shortened meal breaks as required under the FLSA and Pennsylvania state wage and hour laws. ECF No. 1. Plaintiffs brought their FLSA claim as a

collective action on behalf of Defendant's full-time hourly employees throughout the United States, id. ¶ 17, and their state law claims as a class action on behalf of Defendant's hourly employees in Pennsylvania, id. ¶ 21.

According to the Complaint, Named Plaintiff Edwin Altnor worked as an hourly-paid crane operator and inventory clerk at Defendant's South Philadelphia warehouse from May 2010 to December 2013. Id. ¶ 6. He earned a straight-time wage of approximately $14.50 per hour. Id. Defendant regularly scheduled Altnor to work five days per week from 2:30 p.m. to 11:00 p.m., with one unpaid, thirty-minute meal break per shift. Id. Altnor often worked during part of his unpaid meal breaks due to business demands. Id. He alleges that he did not receive overtime pay from Defendant for his work during meal breaks. Id.

Named Plaintiff Christina Oyola worked as an hourly-paid receiving clerk at the same warehouse from October 2013 to August 2014. Id. ¶ 7. She earned a straight-time wage of approximately $15.00 per hour. Id. Defendant regularly scheduled Oyola to work five days per week from 5:30 a.m. to 2:00 p.m., with one unpaid, thirty-minute meal break per shift. Id. Oyola often worked during part of her unpaid meal breaks due to business demands. Id. She alleges that she did not receive overtime pay from Defendant for her work during meal breaks. Id.

3

On January 9, 2015, Defendant filed an Answer that generally denied Plaintiffs' allegations. ECF No. 2. After an initial pretrial conference, this Court referred the matter to Magistrate Judge Thomas J. Rueter for settlement purposes, ECF No. 10. The parties participated in a mediation session with Judge Rueter on October 8, 2015, ECF No. 16, which culminated in an agreement on October 29, 2015, to settle the litigation for $175,000, ECF No. 17.

Thereafter, the parties confirmed the agreement's essential terms, identified the class members, determined the ranges of values for individual damage payments, and prepared a Joint Stipulation of Settlement. ECF No. 18-3.

On January 11, 2016, Plaintiffs filed an unopposed motion for preliminary approval of the proposed settlement agreement; conditional certification of the FLSA collective action; preliminary certification of the state law settlement class; appointment of class representatives and class counsel; and approval of a class notice plan. ECF No. 18.

The Court granted Plaintiffs' motion for preliminary and conditional approval of the proposed settlement agreement. ECF No. 19. In granting preliminary approval, however, the Court underscored that its decision to certify the class/collective and approve the settlement agreement was just that: preliminary. The Court articulated specific areas of concern for the parties

to address at the final fairness hearing stage. Id. at 1 n.1. The Court further explained that the request for final approval must be supported by way of witnesses at the hearing, affidavits, and/or documentation by persons with knowledge of the requisite information, so that the Court could properly discharge its duty of judicial review. Id.

Following preliminary approval, the notice and claim forms were sent to the class members. Cohen Decl. ¶¶ 14, 16-20, ECF No. 21-5. Plaintiffs did not receive any objections, exclusion requests as to the state law class, or written communications from the putative class members. Id. at ¶ 19. Plaintiffs received twenty-four timely requests to participate in the FLSA settlement collective, which results in an FLSA settlement collective of twenty-six members when including two Named Plaintiffs. Id. at ¶ 20.

On April 25, 2016, Plaintiffs filed an unopposed motion for final approval of the settlement agreement. ECF No. 21. Plaintiffs also filed a supplemental memorandum of law in support of the Named Plaintiffs' proposed incentive award and the requested attorneys' fees, which are also unopposed. ECF No. 22. After a final fairness hearing with counsel for the parties on May 25, 2016, ECF No. 25, the motion for final approval is now ripe for disposition.

5

## II.   THE PROPOSED SETTLEMENT AGREEMENT

The terms of the proposed settlement agreement are set forth in the Joint Stipulation of Settlement ("Settlement" or "Settlement Agreement"), ECF No. 21-3, and are outlined below.

### A.   The Proposed Settlement Class and Collective

The Settlement Agreement sets forth the following state law settlement class:

> [A]ll Pennsylvania residents whom Defendant has employed in the following positions since December 1, 2011 who d[id] not submit a timely, valid request to opt-out of the settlement as provided in the Class Notice: belt checker, cleco operator, customer service staff, cycle count clerk, inbound checker, inventory control clerk, inventory lead, maintenance, maintenance helper, order picker, outbound checker, receiving checker, receiving clerk, receiving/shipping assistant, runner, shipping clerk, shipping/receiving checker, switch operator, turret/cleco operator, USDA insp./checker, USDA inspections, or warehouse worker.

Id. at ¶ 20.

The Settlement Agreement sets forth the following "FLSA Settlement Collective":

> All individuals whom Defendant employed in the following positions since December 1, 2011 who submit[ted] a timely, valid opt-in form as provided in the Class Notice: belt checker, cleco operator, customer service staff, cycle count clerk, inbound checker, inventory control clerk, inventory lead, maintenance, maintenance helper, order picker, outbound checker, receiving checker, receiving clerk, receiving/shipping assistant, runner, shipping clerk, shipping/receiving checker, switch operator, turret/cleco operator, USDA insp./checker, USDA inspections, or warehouse worker.

Id. at ¶ 11.

B.    The Proposed Settlement Agreement's Terms

The Settlement Agreement provides that, upon judicial approval, Defendant will pay $175,000 in total to settle Plaintiffs' claims. Settlement Agreement ¶¶ 17, 27, ECF No. 21-3. This amount is to be distributed as follows: $85,000 divided amongst the class and collective members as damages; $8,000 divided equally between the two Named Plaintiffs ($4,000 each) as an enhancement award, id. ¶ 31; $80,000 to class counsel as attorneys' fees, id. ¶¶ 2, 32; and $2,000[1] to class counsel for out-of-pocket costs and expenses, id. ¶¶ 2, 32.

The parties have agreed to a process for determining each member's individual share under the Settlement Agreement. The eighty-one state-law class members will receive one share for each year that he or she worked for Defendant between 2012 and 2015, thereby allowing for a maximum of four state class shares per class member. Cohen Decl. ¶ 12. To be awarded a share for any given year, the class member must have logged payable hours during one pay period for that year. Id. According to class counsel, "[t]his system is intended to strike a fair balance between providing greater compensation to longer-tenured

---

[1]    Class counsel states that $2,574.49 was incurred in out-of-pocket costs but has agreed to accept a cost reimbursement capped at $2,000. Pls.' Suppl. Mem. 7 (citing Cohen Decl. ¶¶ 10-11; Stephan Decl. ¶ 20).

employees (who experienced a greater number of shortened meal breaks), providing a reasonable recovery to all Class members . . .[,] and avoiding the burden and attendant expense of employing a expert to perform damages calculations based on a finer scale (such as awarding a share for each individual day worked)." Pls.' Mem. 22 n.4, ECF No. 12-2 (citing Cohen Decl. ¶ 12, ECF No. 21-5). Class counsel avers that the state law class is entitled to a total of 172 shares based on the applicable employment date ranges. Id. at 22.

Each of the twenty-six FLSA collective action members will receive a share for each year that they worked for Defendant between 2012 and 2015, thereby allowing for up to an additional four shares in addition to his or her state law shares. Cohen Decl. ¶ 12. Counsel avers that the FLSA collective is entitled to a total of sixty-five additional shares based on the applicable employment date ranges. Pls.' Mem. 22.

Combining the shares attributable to both the state law class and FLSA collective, the total number of shares is 241.[2] Thus, the damages payment of $85,000 will be divided into

_____

[2]     There are 172 state class shares, 65 FLSA collective shares, and 4 shares to which each the Named Plaintiffs is entitled. Pls.' Mem. 22; Hr'g Tr. 39:5-16, ECF No. 25.

241 equal shares of $352.70 each,[3] and a class/collective member's total award amount depends on the number of shares to which he or she is entitled in light of the above-mentioned calculation process.

Class counsel will provide Defendant with a final statement of each class/collective member's award within two business days of the Settlement Agreement's effective date. Settlement Agreement ¶ 41. Within seven days of the Settlement Agreement's effective date, Defendant will provide paper checks to the third-party settlement administrator for each class/collective member's total award. Id. ¶ 42. The third-party settlement administrator will promptly mail the checks to each class/collective member. Id. The checks will be negotiable for a period for 120 days, and any participating class/collective member who fails to negotiate his or her check within that period will irrevocably waive his or her right to a settlement share but remain subject to the terms of the judgment, including the release of claims. Id.

Defendant reserves the right to void the Settlement Agreement in its entirety and resume the action if more than ten class members opt out of the state law settlement, the court

---

[3]        Although the Settlement provides for $85,000, it appears that the parties have agreed to a total of $85,000.07 so that the 241 shares can be divided equally. See Pls.' Mem. 22.

does not certify the state law settlement class, or the court does not certify the FLSA settlement collective. Id. ¶ 58.

The Settlement Agreement further provides that any unclaimed funds will be returned to the total class/collective fund to increase the fund's value. Id. ¶ 30. If any class member fails to timely convert his or her check, Defendant will report the total value of unclaimed funds to class counsel and provide class counsel with a check payable to Community Legal Services of Philadelphia for the unclaimed funds' total value as a cy pres remedy. Id. In the event that the Court does not approve the requested incentive award for the Named Plaintiffs or the requested attorneys' fees, the difference between the requested amount and the awarded amount is redistributed to the total class distribution. Id. ¶¶ 31-32.

In exchange for the benefits provided in the Settlement Agreement, the participating class/collective members will release their FLSA and state wage and hour claims against Defendant. Id. ¶¶ 54-57.

## III. DISCUSSION

The parties ask the Court to simultaneously certify a state law class and an FLSA collective, as well as to approve the terms of the proposed Settlement Agreement. As a result, the required analysis is multifaceted. To certify the state law

class, the requirements of Rule 23(a) and Rule 23(b) must be satisfied. To certify the FLSA collective, the Court must review those individuals who have opted into the collective action to ensure that they are in fact similarly situated to the Named Plaintiffs.

Once the state law class and FLSA collective are certified, the Court reviews the terms of the Settlement Agreement for fairness. As to the state law class, the Court considers whether the Settlement's terms are "fair, reasonable, and adequate," pursuant to Federal Rule of Civil Procedure 23(e) and the factors set forth in <u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975), and <u>In re Prudential Ins. Co. Am. Sales Practice Litigation Agent Actions</u>, 148 F.3d 283, 317 (3d Cir. 1998). As to the FLSA collective, the Court reviews the Settlement's terms to ensure that it resolves a bona fide dispute, is fair and reasonable to the plaintiff-employees, and does not impermissibly frustrate the FLSA's implementation in the workplace. Finally, the Court will review the requested attorneys' fees and incentive award for the Named Plaintiffs.

A.   <u>State Law Class Certification under Rule 23</u>

The Court must first determine whether the proposed state law class satisfies the requirements of Federal Rule of Civil Procedure 23. <u>See</u> <u>Sullivan v. DB Invs., Inc.</u>, 667 F.3d 273, 296 (3d Cir. 2011) (en banc). For certification under Rule

11

23, the class must satisfy the prerequisites of Rule 23(a) and one of Rule 23(b)'s three subparts. <u>See</u> <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305, 309-10 (3d Cir. 2008), <u>as amended</u> (Jan. 16, 2009). The party seeking class certification "bears the burden of establishing each element of Rule 23 by a preponderance of the evidence." <u>Marcus v. BMW of N. Am., LLC</u>, 687 F.3d 583, 591 (3d Cir. 2012). Certification is only proper "'if the trial court is satisfied, after a rigorous analysis, that the prerequisites' of Rule 23 are met." <u>In re Hydrogen Peroxide</u>, 552 F.3d at 309 (quoting <u>Gen. Tel. Co. of SW v. Falcon</u>, 457 U.S. 147, 161 (1982)).

### 1.   <u>Rule 23(a) Criteria</u>

Under Rule 23(a), Plaintiffs must demonstrate that (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

First, "[n]o minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." <u>Stewart</u>

v. Abraham, 275 F.3d 220, 226–27 (3d Cir. 2001). Here, the
parties have confirmed that the state law class consists of
eighty-one individuals. Pls.' Mem. 8. Because it would be
impracticable to join eighty-one individual plaintiffs in a
single suit, the numerosity requirement is satisfied.

Second, there must be "questions of law or fact common
to the class." Fed. R. Civ. P. 23(a)(2). The commonality
requirement asks "whether the named plaintiff's claim and the
class claims are so interrelated that the interests of the class
members will be fairly and adequately protected in their
absence." Falcon, 457 U.S. at 157 n.13. And cases involving wage
claims present perhaps "the most perfect questions for class
treatment." Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D.
363, 373 (S.D.N.Y. 2007).

Here, the questions of fact common to the class are
(1) whether class members performed more than de minimus
overtime work for Defendant, (2) whether Defendant required
class members to properly track their shortened or missed meal
breaks, and (3) whether Defendant paid class members any wages
for their meal break work. Pl.'s Mem. 9. The questions of law
common to the class are (1) whether Defendant violated the MWA
by failing to pay the class members for their meal break work,
and (2) whether Defendant violated the WPCL by failing to pay
the class members for their meal break work. Id. Therefore,

13

because the Named Plaintiffs and class members' claims are so interrelated that the interests of the class members are fairly and adequately protected, the commonality requirement is satisfied.

Third, the claims or defenses of the representative parties must be typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims." Baby Neal v. Casey, 43 F.3d 48, 58 (3d Cir. 1994).

Here, Rule 23(a)(3)'s typicality requirement is satisfied. Although individual class members, including the Named Plaintiffs, may have had different supervisors during their employment and their work conditions may have differed to a degree, Pls.' Mem. 20, the Named Plaintiffs' claims are virtually identical in all respects to the other class members' claims, as all class members allegedly worked during part or all of their meal breaks without compensation from Defendant, id. at 10.

Fourth and finally, the Court must determine whether the Named Plaintiffs and class counsel "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of

14

interest between named parties and the class they seek to represent." Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006) (quoting Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 625 (1997)).

Here, the Named Plaintiffs do not appear to have any interests incompatible with the class members' interests, and class counsel has significant experience in pursuing state wage and hour class and FLSA collective actions. See ECF Nos. 22-2, 22-4 (setting forth class counsel's experience). Therefore, because the Named Plaintiffs' interests are not antagonistic to those of other class members, and because class counsel is qualified to conduct the litigation, the adequacy requirement is likewise satisfied. See In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 532 (3d Cir. 2004).

In sum, the proposed state law class meets Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy of representation.

### 2.   Rule 23(b) Criteria

Rule 23(b)(3), under which Plaintiffs seek final class certification, requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other

available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

First, the Court asks the "whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." Sullivan, 667 F.3d at 298. Here, individual class members may have performed their job duties differently, had different supervisors, and experienced various work conditions. Pls.' Mem. 19-20. But Defendant's timekeeping, employee compensation (or lack thereof), and meal break policies were purportedly common to all class members. Plaintiffs state that "[i]n weeks where the Class members logged more than 40 hours of work time, overtime wages for such shortfalls are owed under both federal and state law." Id. at 12. Therefore, questions of law or fact common to the state law class members predominate over any questions affecting only individual members.

Second, the superiority requirement asks the Court to consider (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members"; (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum"; and (4) "the likely

16

difficulties in managing a class action." Fed. R. Civ. P.
23(b)(3)(A)-(D).

Here, the eighty-one individual class members likely
have limited financial resources to prosecute individual
actions. Due to "the relatively small amount recoverable by each
potential litigant, it is unlikely that, absent the class action
mechanism, any one individual would pursue his claim, or even be
able to retain an attorney willing to bring the action." Lake v.
First Nationwide Bank, 156 F.R.D. 615, 626 (E.D. Pa. 1994).
Furthermore, there is no indication of any other actions that
have been brought against Defendant based on the same conduct.
And when "[c]onfronted with a request for settlement-only class
certification," as is the case here, "a district court need not
inquire whether the case, if tried, would present intractable
management problems . . . for the proposal is that there be no
trial." Amchem, 521 U.S. at 620. Finally, this Court is a
desirable forum for the litigation, because the alleged conduct
occurred in Philadelphia. As such, the proposed state law class
meets Rule 23(b)(3)'s predominance and superiority requirements.

Therefore, because the prerequisites of Rule 23(a) and
Rule 23(b)(3) are satisfied, the Court will certify the state
law class.

B.   <u>FLSA Collective Certification</u>

The Court next turns to whether the proposed FLSA collective may be certified. When an employer fails to comply with the FLSA's requirements, employees can pursue an action against the employer on "behalf of himself" and in a representative capacity for "other employees similarly situated." 29 U.S.C. § 216(b); <u>Symczyk v. Genesis HealthCare Corp.</u>, 656 F.3d 189, 192 (3d Cir. 2011), <u>rev'd on other grounds</u>, 133 S. Ct. 1523 (2013). The Third Circuit has affirmed use of a two-stage approach to determine whether putative members of a proposed FLSA collective are "similarly situated." <u>Zavala v. Wal Mart Stores Inc.</u>, 691 F.3d 527, 536 & n.4 (3d Cir. 2012) (citing <u>Myers v. Hertz Co.</u>, 624 F.3d 537, 555 (2d Cir. 2010)).

At the first stage, "the court makes a preliminary determination whether the employees enumerated in the complaint can be provisionally categorized as similarly situated to the named plaintiff." <u>Symczyk</u>, 656 F.3d at 192. The level of proof required at this stage is fairly lenient, requiring a "'modest factual showing' that the proposed recipients of opt-in notices are similarly situated." <u>Id.</u> at 192–93 (citation omitted). Under this standard, "a plaintiff must produce some evidence, 'beyond pure speculation,' of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." <u>Id.</u> at 193 (citing <u>Smith</u>

18

v. Sovereign Bancorp, Inc., No. 03-2420, 2003 WL 22701017, at *3
(E.D. Pa. Nov. 13, 2003)).

"If the plaintiffs have satisfied their burden at the
first stage, the court will 'conditionally certify' the
collective action for the purpose of facilitating notice to
potential opt-in plaintiffs and conducting pre-trial discovery."
Camesi v. Univ. of Pittsburgh Med. Ctr., 729 F.3d 239, 243 (3d
Cir. 2013) (citing Zavala, 691 F.3d at 536). The Third Circuit
has explained that this "conditional certification" is not
really certification; rather, it is "'the district court's
exercise of [its] discretionary power . . . to facilitate the
sending of notice to potential class members,' and 'is neither
necessary nor sufficient for the existence of a representative
action under [the] FLSA.'" Zavala, 691 F.3d at 536 (first
alteration in original) (quoting Symczyk, 656 F.3d at 194).

Here, the Court previously determined that the
collective-employees can be provisionally categorized as
similarly situated to the Named Plaintiffs, so the Court
conditionally certified the FLSA collective. ECF No. 19, at ¶ 3.
Thereafter, the notice and claim forms were mailed to the
putative members of the collective. Cohen Decl. ¶¶ 16-20.

Next, "with the benefit of 'a much thicker record than
it had at the notice stage,'" the Court turns to step two of the
FLSA collective approval process. See Symczyk, 656 F.3d at 193

19

(quoting Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008)). "This step may be triggered by the plaintiffs' motion for 'final certification,' by the defendants' motion for 'decertification,' or commonly, by both." Camesi, 729 F.3d at 243 (citing Symczyk, 656 F.3d at 193).

At this second stage, the court "'makes a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiff.'" Id. (quoting Symczyk, 656 F.3d at 193) (emphasis added); see also Zavala, 691 F.3d at 536 ("It is clear from the statutory text of the FLSA that the standard to be applied on final certification is whether the proposed collective plaintiffs are 'similarly situated.'").

This second stage--final certification--is now at issue in this case. To determine whether each individual who has opted into the collective action is "in fact similarly situated to the named plaintiff," Camesi, 729 F.3d at 243, the Court may consider "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." Zavala, 691 F.3d at 536-37 (citing Ruehl v. Viacom, Inc., 500 F.3d 375, 388 n.17 (3d Cir. 2007)). It is Plaintiffs' burden to establish by a preponderance of the

20

evidence that they satisfy the similarly situated requirement.
Id. at 537.

Here, the twenty-six individuals who opted into the
FLSA collective action worked for Defendant in the same location
and had the same type of schedule (i.e., five days per week on
one of three different 8.5-hour shifts). Pls.' Mem. 14. They
also received similar salaries (i.e., between $12 and $20 per
hour) and worked for Defendant under similar payroll, meal
break, and timekeeping policies, procedures, and systems. Id.
Additionally, those who opted into the collective action seek to
advance the same claims and obtain the same relief (i.e., each
member seeks to recover unpaid overtime wages for shortened meal
breaks). Id. Although each member may have had different
supervisors during their employment and their work conditions
may have differed to a degree, Pls.' Mem. 20, these differences
do not outweigh the similarities in the factual basis of their
claims. See, e.g., Leap v. Yoshida, No. 14-3650, 2016 WL
1730693, at *6 (E.D. Pa. May 2, 2016) (certifying a collective
action where the waiter-plaintiffs advanced the same claims and
sought the same relief as to the defendant's various alleged
tip-related wage violations). But see Jarosz v. St. Mary Med.
Ctr., No. 10-3330, 2014 WL 4722614, at *7-8 (E.D. Pa. Sept. 22,
2014) (decertifying an FLSA collective action where plaintiffs
"held a variety of different positions in many different

21

departments, and worked under numerous supervisors"). Therefore, the twenty-six individuals who opted into the FLSA collective action are in fact similarly situated, and the collective will be certified.

C.   The Fairness of the Proposed Settlement

Having certified the state class and FLSA collective, the Court next considers the fairness of the proposed Settlement Agreement's terms.

1.   Class Action Settlement

After the Court determines that Rule 23(a) and (b)'s requirements are met for class certification--here, involving the state law claims--it must then "separately 'determine that the settlement is fair to the class under [Rule] 23(e).'" Sullivan, 667 F.3d at 319 (alteration in original) (quoting In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 257 (3d Cir. 2009)). In "cases such as this, where the parties simultaneously seek certification and settlement approval," the Third Circuit has instructed "'courts to be even more scrupulous than usual' when they examine the fairness of the proposed settlement." In re Prudential, 148 F.3d at 317 (quoting In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 806 (3d Cir. 1995)). "This heightened standard is designed to ensure that class counsel has demonstrated 'sustained advocacy'

22

throughout the course of the proceedings and has protected the interests of all class members."[4] Id. (quoting In re Gen. Motors Corp., 55 F.3d at 806).

---

[4]     Curiously, the Third Circuit has stated that a court's preliminary approval of a class action settlement agreement "establishes an initial presumption of fairness when the court finds that (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the settlement's proponents are experienced in similar litigation; and (4) only a small fraction of the class objected. In re Gen. Motors Corp., 55 F.3d at 785.

        The Third Circuit later qualified the applicability of the presumption of fairness. The court explained that although "it is true that an order of preliminary approval may establish 'an initial presumption of fairness' in some circumstances, that presumption does not inexorably result in final approval of a settlement. It is clear that the court should not give rubber-stamp approval." Ehrheart v. Verizon Wireless, 609 F.3d 590, 603 (3d Cir. 2010) (internal citation and footnote omitted).

        But this qualification does not resolve the tension between a presumption of fairness and the level of scrutiny otherwise required for final approval of a class action settlement. The presumption of fairness suggests a relaxed starting point for final review so long as the reviewing court previously granted preliminary approval, but the Third Circuit has stated that final review should be "even 'more scrupulous than usual' when examining the fairness of the proposed settlement" when the plaintiffs seek to simultaneously certify the class and finalize the settlement. Warfarin, 391 F.3d at 534 (quoting In re Gen. Motors Corp., 55 F.3d at 805).

        The validity of the presumption is further placed into question by the overlap between the analysis required for the presumption to attach and the analysis required under Girsh and Prudential. Compare In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436 (3d Cir. 2016) (presumption of fairness applies where "(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected" (quoting In re Cendant Corp. Litig., 264 F.3d 201, 232 (3d Cir.

The Third Circuit set forth specific factors in Girsh
v. Jepson, 521 F.2d 153 (3d Cir. 1975), that a court should
consider when assessing the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the
> amount of discovery completed; (4) the risks of
> establishing liability; (5) the risks of establishing
> damages; (6) the risks of maintaining the class action
> through trial; (7) the ability of the defendants to
> withstand a greater judgment; (8) the range of
> reasonableness of the settlement fund in light of the
> best possible recovery; (9) the range of
> reasonableness of the settlement fund to a possible
> recovery in light of all the attendant risks of
> litigation.

See id. at 157 (ellipses omitted).

Here, the complexity, expense, and likely duration of

litigation is a neutral factor. Plaintiffs state that "absent a

---

2001))), with Girsh, 521 F.2d at 157 (stating that courts should
consider "the reaction of the class to the settlement" and "the
stage of the proceedings and the amount of discovery
completed"). As such, determining whether a proposed class
action settlement is entitled to a presumption of fairness while
also requiring a rigorous analysis under Girsh and Prudential
is, at worst, contradictory or illusory and, at best, redundant.

In any event, each requirement for a presumption of
fairness is satisfied here. The parties participated in
settlement discussions under the auspices of Magistrate Judge
Thomas J. Rueter. ECF Nos. 16, 17. Class counsel conducted pre-
filing research and analysis of Plaintiffs' claims. Cohen Decl.
¶ 5. Defendant produced a number of key documents in response to
Plaintiffs' discovery requests, including hours reports,
earnings reports, and class lists. Id. at ¶¶ 5, 8. Class counsel
is also experienced in state class action and FLSA collective
action litigation on similar matters. ECF Nos. 22-2, 22-3. And
no class members objected. Cohen Decl. ¶ 19. Therefore, a
presumption of fairness attaches.

settlement, the continued litigation of this case would likely be lengthy, burdensome and expensive for both Parties." Pls.' Mem. 17. Surely, continuing the case would have required additional discovery and the filing of pretrial motions to address factual and legal questions, which would increase costs for both sides. And this case is presumably more complex than a single-plaintiff case. But Plaintiffs have not alleged any complexity unique to this case, and there were no dispositive motions filed or novel legal issues raised by the parties.

The second Girsh factor "attempts to gauge whether members of the class support the settlement." In re Prudential, 148 F.3d at 318. Plaintiffs have not received any objections to the proposed settlement, requests to be excluded from the proposed settlement, or written communications from class members. Cohen Decl. ¶ 19. Therefore, this factor favors approval.

The third Girsh factor requires the Court to consider the stage of the proceedings and the amount of discovery completed. 521 F.2d at 157. The settlement negotiations here were informed by "Hours Reports," which identified the daily shift hours and meal break hours worked by each class member, along with other time-related information; "Earnings Reports," which identified each class member's pay dates, hours, regular earnings, overtime earnings, rate of pay, and other pay-related

information; another "Hours Report," which focused on the duration of each class member's meal breaks; and a "Class List," which included the start and end dates of employment as well as job titles for each individual whose time records included "short" meal break entries. Cohen Decl. ¶ 5.

Moreover, after the first conference with Magistrate Judge Rueter on October 8, 2015, Defendant provided Plaintiffs with additional time and payroll information. Id. ¶¶ 7, 8. The parties then engaged in further negotiations and another settlement conference with Judge Rueter, during which the parties agreed to settle Plaintiffs' claims. Id. ¶ 8. Based on the discovery conducted, the Court can fairly conclude that the parties had an "adequate appreciation of the merits of the case before negotiating." In re Gen. Motors Corp., 55 F.3d at 813. Therefore, this factor favors approval.

As to the fourth and fifth Girsh factors, the risks of establishing liability and damages in this case are not readily apparent. No dispositive motions, which might uncover any significant hurdles to establishing liability or damages, have been filed. Cf. Thompson v. Celink, No. 01-5993, 2002 WL 32351174, at *4 (E.D. Pa. July 26, 2002) ("The class counsel face significant risks in establishing liability and damages, particularly in light of the arguments raised in defendant's motion for summary judgment."). And the thrust of discovery was

the amount of compensation due to the class and collective members, with little focus on Defendant's actual liability under the FLSA or state wage and hour statutes. See Hr'g Tr. 36:6-37:8, 38:12-39:4, ECF No. 25.

But "the court must, to a certain extent, give credence to the estimation of the probability of success proffered by class counsel, who are experienced with the underlying case, and the possible defenses which may be raised to their cause of action." Lachance v. Harrington, 965 F. Supp. 630, 639 (E.D. Pa. 1997) (citing Lake, 900 F. Supp. at 732). And here, Plaintiffs state that they may have faced material risks in establishing liability and damages given the "disparity in the Parties['] factual and legal positions." Pls.' Mem. 20. Therefore, this factor is neutral as well.

The likelihood of maintaining a class certification if the action were to proceed to trial, which is the sixth Girsh factor, weighs in favor of approval. 521 F.3d at 157. But it deserves only minimal consideration. "There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement." In re Prudential, 148 F.3d at 321. As such, in a settlement class, this factor becomes essentially "toothless." Id. (citing Amchem, 521 U.S. at 620).

As to the seventh _Girsh_ factor, Defendant's ability to
withstand a greater judgment is neutral, because the parties do
not allege that Defendant has any degree of financial
instability as a justification for the settlement's amount.
Plaintiffs merely state that "there is little basis to conclude
that the case would be worth more at a later stage, or that
Defendant's ability to pay would have become relevant later in
the litigation." Pls.' Mem. 21.

The eighth and ninth _Girsh_ factors require the Court
to assess "whether the settlement represents a good value for a
weak case or a poor value for a strong case." _Warfarin_, 391 F.3d
at 538. "The factors test two sides of the same coin:
reasonableness in light of the best possible recovery and
reasonableness in light of the risks the parties would face if
the case went to trial." _Id._ Much as it is in the typical one-
plaintiff-one-defendant case, the ultimate test of the value of
a settlement in the class context is who gets what and how much.

Plaintiffs suggest that these two factors "weigh
strongly in favor of approving the settlement because the amount
recovered in this case exceeds the typical result in many class
action lawsuits." Pls.' Mem. 22-23. But Plaintiffs miss the
mark. The Court is to compare the possible recovery to the
settlement amount in the case at bar, not based on all other

class action cases across the board. See In re Prudential, 148 F.3d at 322 (quoting In re Gen. Motors Corp., 55 F.3d at 806).

Nevertheless, the range of reasonableness of the settlement fund in this case represents a fair deal for the class. If Plaintiffs were successful in their claims, they would likely be entitled to unpaid overtime wages. After reviewing the class members' actual time and pay across the relevant time period, Plaintiffs calculated the total value of unpaid wage figures for all class members to be approximately $60,000. Cohen Decl. ¶ 10. The parties negotiated a settlement that provides a total of $85,000 for the settlement fund, amounting to 140% of the claimed maximum value owned. Id. ¶ 12. This settlement amount exceeds the alleged damages, and it is substantial in light of the inherent risks of trial. In essence, the settlement provides a degree of certainty for Plaintiffs that litigation would not. Pls.' Mem. 22. Therefore, the settlement amount represents a good value for the case.

Because the Girsh factors, on balance, favor approval of the Settlement Agreement, the Court finds the terms to be fair, reasonable, and adequate.

## 2.  Collective Action Settlement

The Court next determines whether the proposed settlement of Plaintiffs' FLSA claims "'is a fair and reasonable

resolution of a bona fide dispute over FLSA provisions' rather than 'a mere waiver of statutory rights brought about by an employer's overreaching.'" Cuttic v. Crozer-Chester Med. Ctr., 868 F. Supp. 2d 464, 466 (E.D. Pa. 2012) (quoting Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350, 1354 (11th Cir. 1982)). A proposed settlement resolves a bona fide dispute if its terms "reflect a reasonable compromise over issues, such as . . . back wages, that are actually in dispute." Lynn's Food, 679 F.2d at 1354. "In essence, for a bona fide dispute to exist, the dispute must fall within the contours of the FLSA and there must be evidence of the defendant's intent to reject or actual rejection of that claim when it is presented." Kraus v. PA Fit II, LLC, No. 15-4180, 2016 WL 125270, at *10 (E.D. Pa. Jan. 11, 2016).

Here, the Settlement Agreement resolves a bona fide dispute between the parties. After Plaintiffs filed their Complaint, Defendant filed an answer generally denying all allegations therein. ECF No. 2. The parties engaged in a day-long settlement conference with Magistrate Judge Rueter on October 8, 2015, but the parties could not reach an agreement at that time. Cohen Decl. ¶¶ 6-7; ECF No. 16. Thereafter, Defendant produced documents challenging Plaintiffs' alleged damages. Cohen Decl. ¶ 8. And throughout negotiations, Defendant maintained that the proposed class/collective certification was

improper due to differences between the factual and legal issues among putative class/collective members. Id. at ¶ 11.

Moreover, the dispute concerning overtime pay owed to class members is precisely the type of dispute the FLSA is designed to address. Barrentine v. Arkansas—Best Freight Sys., Inc., 450 U.S. 728, 739 (1981) (explaining that the FLSA was designed "to ensure that each employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from 'the evil of overwork as well as underpay.'" (quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt))). Therefore, because this continued dispute falls within the FLSA's contours and evidences Defendant's rejection of Plaintiffs' claims, the proposed settlement reflects a compromise over FLSA issues actually in dispute.

Having determined that the Settlement Agreement concerns a bona fide dispute, the Court next conducts a two-part fairness inquiry to ensure that (1) the settlement is fair and reasonable for the employees, and (2) the settlement furthers the FLSA's implementation in the workplace. See Mabry v. Hildebrant, No. 14-5525, 2015 WL 5025810, at *2 (E.D. Pa. Aug. 24, 2015); McGee v. Ann's Choice, Inc., No. 12-2664, 2014 WL 2514582, at *2 (E.D. Pa. June 4, 2014).

First, "[w]hile factors for evaluating 'fairness' of a settlement in an FLSA collective action have not been

31

definitively set out by the Third Circuit, district courts in
this Circuit have utilized the Girsh factors established for
approving Rule 23 class action settlements."[5] Brumley v. Camin
Cargo Control, Inc., Nos. 08-1798, 10-2461, 09-6128, 2012 WL
1019337, at *4 (D.N.J. Mar. 26, 2012).

Here, as previously discussed, the Girsh factors favor
approval of the proposed Settlement Agreement. Therefore, the
Court finds that the proposed settlement of Plaintiffs' FLSA
claims is fair and reasonable for the plaintiff-employees.

Second, the Court must consider whether the settlement
frustrates the implementation of the FLSA in the workplace. The
proposed Settlement Agreement here does not contain a
confidentiality clause, thereby avoiding a common basis for
rejecting a proposed FLSA collective settlement. See, e.g.,
Mabry, 2015 WL 5025810, at *2-3. The Settlement Agreement states
that the parties will keep the Settlement's terms, information
about negotiations, and information about other settlement
documents confidential until the parties file their motion for
preliminary approval, Settlement Agreement ¶ 44, which has
already occurred.

---

[5]         However, the Girsh factors do not necessarily control
the analysis where parties seek judicial approval of a private
FLSA settlement. See Kraus, 2016 WL 125270, at *4 n.3.

Also, the Settlement does not contain impermissibly broad release provisions, which avoids yet another common pitfall. See, e.g., Kraus, 2016 WL 125270, at *12-13; Bettger v. Crossmark, Inc., No. 13-2030, 2015 WL 279754, at *8-10 (M.D. Pa. Jan. 22, 2015). Here, although broad, the "Release of Claims" section of the Settlement Agreement properly limits its reach. Settlement Agreement ¶¶ 54-57. The Settlement specifies that Defendant is to be released "from any and all claims that arise from or relate to the claims alleged in the Action" as well as claims "that could have been made based upon the allegations contained in the Complaint[] filed in this Action." Id. ¶ 56 (emphasis added). Moreover, the Settlement states that "[t]his release excludes the release of any claims not permitted to be released by law." Id. (emphasis added). And there are further limitations specific to the claims themselves. See id. ¶ 54 (state class action); ¶ 55 (FLSA collective action). Therefore, the Court finds that the Settlement's terms do not impermissibly frustrate the FLSA's implementation.

D.   Attorneys' Fees

The Court next addresses the proposed $80,000 in attorneys' fees, which represents approximately 45% of the total settlement amount of $175,000. See Pls.' Suppl. Mem. 3. Under the FLSA, the Court "shall, in addition to any judgment awarded

33

to the . . . plaintiff[s] allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). In the Third Circuit, "[t]he percentage-of-recovery method is generally favored in cases involving a common fund" because it "allow[s] courts to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.'" In re Prudential, 148 F.3d at 333 (quoting In re Gen. Motors Corp., 55 F.3d at 821). The percentage-of-recovery method is also the prevailing methodology used by courts in the Third Circuit in wage and hour cases. Keller v. TD Bank, N.A., No. 12-5054, 2014 WL 5591033, at *14 (E.D. Pa. Nov. 4, 2014). This method awards a fixed portion of the settlement fund to counsel. McGee, 2014 WL 2514582, at *4.

The Court will consider seven factors to determine the reasonableness of the requested fees under the percentage-of-recovery method:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or the fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by counsel; and (7) awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). Of course, "[e]ach case is different, and in certain cases, one factor may outweigh the rest." Id.

The Court first considers the size of the fund created and the number of persons benefitted. "As a general rule, as the size of a fund increases, the appropriate percentage to be awarded to counsel decreases." In re Cendant, 232 F. Supp. 2d at 337. This inverse relationship rests on the assumption that the increase in a recovery's size is often due to the size of the class and not the efforts of counsel. In re Prudential, 148 F.3d at 339.

Here, the total common fund is $175,000, which would provide a recovery amount between $352.70 and $2,821.60[6] for each of the eighty-one class/collective members based on the proposed terms. Pls.' Mem. 22. Class counsel requests $80,000 in attorneys' fees, which represents 45% of the $175,000 settlement fund. As will be discussed infra, the requested percentage of recovery falls on the higher end of the spectrum of the requests approved in this Circuit.

The Court next considers the presence or absence of substantial objections by class members to the settlement terms and/or requested attorneys' fees. Here, there have been no

_____

[6]      See supra pages 7-8 for the manner by which each share is calculated.

35

objections to the settlement or the proposed attorneys' fees award, which favors approval of the requested fees "without reduction." <u>Keller</u>, 2014 WL 5591033, at *15 (citing <u>In re Rite Aid Corp. Sec. Litig.</u>, 396 F.3d 294, 305 (3d Cir. 2005)).

Also, as to the skill and efficiency of the attorneys involved, class counsel has considerable experience handling class and collective action disputes. <u>See generally</u> ECF Nos. 22-1, 22-2, 22-3, 22-4. Moreover, class counsel has worked efficiently to achieve a favorable result for the class. Therefore, this factor also favors approval of the requested attorneys' fees.

Next, the Court considers the complexity and duration of the litigation. Class counsel has not depicted the case as complex. The parties reached a settlement before any dispositive motions were filed to challenge the case's basis, and the case does not appear to have been unusually or especially complicated, either factually or legally, when compared to other class and collective actions.[7] As to duration, this case was

---

[7]     At least one court in the Eastern District of Pennsylvania has stated that "FLSA claims and wage-and-hour law enforcement through litigation has been found to be complex by the Supreme Court and lower courts." <u>Brumley</u>, 2012 WL 1019337, at *11. The <u>Brumley</u> court cited to <u>Barrentine v. Arkansas-Best Freight System, Inc.</u>, 450 U.S. 728, 743 (1981), for support. But this is not to say any and all FLSA claims are per se "complex." Rather, the <u>Brumley</u> court's proposition must be taken in context. <u>Brumley</u> involved the analysis of wage-and-hour records for more than 112 plaintiffs. 2012 WL 1019337, at *11. And the

filed approximately one and one-half years ago on December 11, 2014. ECF No. 1. Therefore, this factor appears neutral at most.

The Court also considers the risk of nonpayment and the amount of time devoted to the case by counsel. Here, class counsel took this case on a contingent fee basis, so there was a risk of nonpayment if the case did not generate a recovery. See ECF No. 22-1 ¶ 13. Mr. Cohen dedicated over 221 hours to this case, ECF No. 22-1 ¶¶ 4, 5, and Mr. Stephan dedicated over 27 hours, ECF No. 22-3 at 7. But counsel's efforts do not reach the level of efforts typically seen in cases where a high percentage of recovery has been approved. Cf. Mabry, 2015 WL 5025810, at *4 (approving attorneys' fees amounting to 40% of total settlement where counsel spent seventy-five hours on the case and propounded three sets of interrogatories, two sets of document requests, one set of requests for admission, among other things); Lyons v. Gerhard's Inc., No. 14-6693, 2015 WL 4378514, at *5 (E.D. Pa. July 16, 2015) (approving attorneys' fees amounting to 44% of the total settlement amount where counsel reviewed approximately 12,000 pages of documents and conducted a deposition); Brumley, 2012 WL 1019337, at *11 (awarding

---

Supreme Court explained in Barrentine that "many arbitrators may not be conversant with the public law considerations underlying the FLSA," where the "claims typically involve complex mixed questions of fact and law" that "must be resolved in light of volumes of legislative history[,] . . . legal interpretation and administrative rulings." 450 U.S. at 743.

attorneys' fees amounting to one third of the settlement fund plus costs where counsel dedicated over 5,200 hours over four years, took and defended depositions, and reviewed and analyzed time and payroll data). Nevertheless, having assumed the risk of nonpayment under the contingency agreement, this factor slightly weighs in favor of awarding class counsel's requested fees.

Finally, the Court considers awards in similar cases. "In this Circuit, the percentage of the recovery award in FLSA common fund cases ranges from roughly 20-45%." Mabry, 2015 WL 5025810, at *4 (collecting cases). Here, class counsel requests 45% of the total recovery, and class counsel recognizes that this figure is "at the high end of commonly accepted fee awards." See Pls.' Suppl. Mem. 3. But class counsel contends that the higher percentage is justified, in large part, by a lodestar cross-check.

The Third Circuit has stated that "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method." In re Rite Aid Corp., 396 F.3d at 305 (citing In re Prudential, 148 F.3d at 333). The lodestar crosscheck is performed by calculating the "lodestar multiplier," which is determined by dividing the requested fee award by the lodestar. In re AT & T Corp., 455 F.3d 160, 164 (3d Cir. 2006). To determine the lodestar method's suggested total, the court multiplies "the number of hours reasonably worked on a

38

client's case by a reasonable hourly billing rate for such services." In re Rite Aid Corp., 396 F.3d at 305.

In this case, class counsel represents that they have accumulated a total lodestar bill of $155,192.50. Pls.' Suppl. Mem. 4; ECF No. 22-1, at ¶ 7; ECF No. 22-3, at ¶ 11. When calculated against the requested fee of $80,000, the lodestar multiplier is 0.515. "A lodestar multiplier of less than one," like the lodestar multiplier here, "reveals that the fee request constitutes only a fraction of the work that the attorneys billed" and thus favors approval. Carroll v. Stettler, No. 10-2262, 2011 WL 5008361, at *8 (E.D. Pa. Oct. 19, 2011).

But the lodestar cross-check remains non-dispositive, and its relevance is increasingly challenged by the realities of today's legal practice. The lodestar cross-check requires the Court to consider "a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." In re Rite Aid Corp., 396 F.3d at 305. But when many areas of legal practice today are no longer founded on standard hourly rates and more commonly driven by fixed fees, blended rates, and

contingency fee agreements,[8] the lodestar cross-check has become largely illusory.

The absence of an objective gauge by which the Court can reasonably cross check the fairness of requested attorneys' fees creates a breeding ground for abuse by class counsel. <u>See, e.g.</u>, <u>Goldberger v. Integrated Res.</u>, 209 F.3d 43, 48 (2d Cir. 2000) (stating that the lodestar creates "a temptation for lawyers to run up the number of hours for which they could be paid"); <u>Kirchoff v. Flynn</u>, 786 F.2d 320, 324 (7th Cir. 1986) (explaining that the lodestar method creates an incentive to increase hours).[9]

Theoretically, there are restraints inherent to the lodestar method to curb unnecessary billing in contingent fee cases, such as the risk of not succeeding at trial and therefore

---

[8]      Am. Bar Ass'n, <u>Making Alterative Fee Arrangements Work for Any Size Law Firm</u>, YourABA: E-news for Members (July 2015), <u>available at</u> http://www.americanbar.org/publications/youraba/ 2015/july-2015/making-alternative-fee-arrangements-work-for-any-size-law-firm.html (noting a recent report that showed "alternative fee arrangements"--those not tied to the billable hour--were up from 5% of total revenue in 2008-2009 to 22% in 2015).

[9]      The Third Circuit Task Force on the Selection of Class counsel also recognized that the lodestar method "may create incentives for counsel to postpone an early settlement that would favor the class, in order to bill more hours." Third Circuit Task Force on the Selection of Class Counsel, Third Circuit Task Force on the Selection of Counsel: Final Report 20-21 (Jan. 2002), <u>available at</u> http://www.ca3.uscourts.gov/ sites/ca3/files/final%20report%20of%20third%20circuit%20task%20f orce.pdf (Jan. 2002).

collecting nothing, or the risk that the reviewing court may find any portion of the logged hours unreasonable. But, in practice, these purported restraints may remain simply theoretical if requested fee awards are approved by courts without close inquiry. See, e.g., John C. Coffee, Jr., Class Wars: The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343, 1348 n.14 (1995) (referencing a study that analyzed class actions closed between July 1, 1992, and June 30, 1994, in the Eastern District of Pennsylvania and Northern District of California, and found that the court awarded the exact amount of attorneys' fees requested by the plaintiffs' attorneys in approximately 83-84% of all cases).

In fact, a court's inquiry is limited by the method itself. "By nature [lodestar multipliers] are discretionary and not susceptible to objective calculation." In re Prudential, 148 F.3d at 340 (citing Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237, 247 (Oct. 8, 1985)). When counsel submits a fee request, it is rarely opposed, and the court is without a responding source of information against which to assess the requested amount. See, e.g., Coleman v. Kaye, 87 F.3d 1491, 1509-10 (3d Cir. 1996) (explaining that "a district court may not set attorneys' fees based upon a generalized sense of what is customary or proper, but rather must rely upon the record"); In re Activision Sec. Litig., 723 F. Supp. 1373, 1374

41

(N.D. Cal. 1989) ("It is at this point in these and other common
fund cases that the court is abandoned by the adversary system
and left to the plaintiff's unilateral application and the
judge's own good conscience.").

Here, for example, class counsel submits a lodestar
bill based on counsel's own typical and customary rates. Pls.'
Suppl. Mem. 4; see S.D. v. Manville Bd. of Educ., 989 F. Supp.
649, 656 (D.N.J. 1998) (explaining that the court was "left to
mere speculation as to what billing rates might be appropriate"
where counsel submitted her own affidavits regarding hourly
rates). But counsel candidly admitted that he has no client who
compensates him on an hourly basis with the client's own funds.
Hr'g Tr. 12:2-12, ECF No. 25. Nor can counsel point to rates
charged by other lawyers representing plaintiffs in FLSA cases,
because those lawyers are also without clients who pay out-of-
pocket and instead rely exclusively on fee percentages awarded
by the courts.[10] This gap is sometimes bridged by submitting data

---

[10]     This type of arrangement has some of the features of a
cartel. See, e.g., Frank H. Easterbrook, The Limits of
Antitrust, 63 Tex. L. Rev. 1, 20 (1984) (describing "the cartel"
as "an agreement among rivals to raise price"). Justifying one
price based on a so-called "competitor's price" when both exist
in the same illusory market gives rise to an alternative
universe that pushes up prices based on the perceived market
value of services rather than their actual market value. See
Bruch Wardhaugh, Cartels, Markets, and Crime: A Normative
Justification for the Criminalisation of Economic Collusion 45
(2014) ("The conduct of the hard-core cartelist strikes at our
expectations for a fair environment for exchange. By agreeing on

of real rates paid by clients to lawyers with similar levels of experience, handling substantially similar matters in the same geographic market, or by pointing to the rates that the defendant in the case pays to its own counsel. See Coleman, 87 F.3d at 1509. In this case, however, class counsel has not submitted any such data.

In light of these concerns, the Court will give class counsel's lodestar cross-check little weight. Instead, the Court will focus on factors relevant to the percentage-of-recovery method[11] discussed supra.

One court determined that approved attorneys' fees in FLSA settlement agreements range "from roughly 20-45%." Mabry, 2015 WL 5025810, at *4 (collecting cases). Another court has noted that "[s]cores of cases exist where fees were awarded in the one-third to one-half of the settlement fund." In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 134 (D.N.J. 2002).

_____

prices, quantities and markets with illusory 'competitors,' the cartelists have created hidden rules, known only to themselves, but by which all are expected to play.").

[11]     Of course, the percentage-of-recovery method is not without its weaknesses. For example, the Third Circuit Task Force noted that courts "risk awarding windfall recoveries to lawyers in some cases and denying reasonable compensation in others" if courts fall into the trap of applying "a 'standard' percentage no matter what." Third Circuit Task Force, supra note 9, at 21. As such, the Third Circuit has instructed that a district court should not "rely on a formulaic application of the appropriate range in awarding fees but must consider the relevant circumstances of the particular case." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 736 (3d Cir. 2001).

As such, subject to the circumstances of a particular case, a benchmark of one-third of the settlement fund is often appropriate to prevent a windfall to counsel. See, e.g., In re Gen. Instrument Sec. Litig., 209 F. Supp. 2d 423, 434 (E.D. Pa. 2001) (approving attorneys' fees amounting to 33% of $48 million settlement in securities class action after six years of litigation featuring extensive discovery and significant motion practice); In re Med. X-Ray Film Antitrust Litig., No. 93-5904, 1998 WL 661515, at *8 (E.D.N.Y. Aug. 7, 1998) (approving attorneys' fees of 33.3% of $39 million settlement of five-year-old antitrust class action).

Upon application of the Gunter factors and consideration of the circumstances surrounding this case, the Court concludes that a fee award of $57,667, which is equal to one-third of the net settlement fund ($173,000) after deducting litigation costs ($2,000) from the total common fund amount ($175,000), is reasonable and fair. See, e.g., Grier v. Chase Manhattan Auto. Fin. Co., No. 99-180, 2000 WL 175126, at *8 (E.D. Pa. Feb. 16, 2000) (approving attorneys' fees amounting to one-third of the net settlement fund after deducting costs); see also Creed, 2013 WL 5276109, at *6 (determining that "an award of one-third of the settlement is consistent with similar settlements throughout the Third Circuit"); Bredbenner, 2011 WL

1344745, at *18-19 (approving an award of 32.6% of the settlement fund).

Attorneys' fees in the amount of $57,667, combined with the litigation costs in the amount of $2,000, equals $59,667 as the total amount of costs and fees to be awarded to class counsel. The difference between the requested amount and the awarded amount is $22,333, which "will be returned to the Class Member Distribution Amount to increase the value of the claimed shares pursuant to the calculations identified." Settlement Agreement ¶ 32.

E.   Incentive Award

Finally, the Court considers the requested incentive award for the Named Plaintiffs. The Settlement proposes that each Named Plaintiff receive $4,000 in addition to the amount that they stand to receive from the common fund as members of the class/collective.

Incentive awards, also known as "enhancement awards" or "service payments," are common in class actions that result in a common fund for distribution to the class. The Third Circuit has stated that incentive awards in the general, class action context exist "to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation." Sullivan v. DB Invs., Inc., 667 F.3d 273, 333 n.65 (3d Cir. 2011). To the extent that named

45

plaintiffs' participation in bringing the litigation is in the nature of a "private attorney general," incentive awards can be construed as a tool to "reward the public service" of named plaintiffs for contributing to the enforcement of mandatory laws. See In re Cendant Corp., Derivative Action Litig., 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (citing In re SmithKline Beckman Corp. Sec. Litig., 751 F. Supp. 525, 535 (E.D. Pa. 1990)).

An incentive award that comes out of the payment allocated for attorneys' fees need not be subject to intense scrutiny, because the interests of the public and the defendants are not directly affected.[12] See In re Cendant, 232 F. Supp. 2d at 344 (citing In re Presidential Life Sec., 857 F. Supp. 331, 337 (S.D.N.Y. 1994)). But where the proposed incentive award comes out of the common fund independent of attorneys' fees, as it does here, Settlement Agreement ¶¶ 31, 32, the court must

---

[12] Although, in such cases, the court should ensure that the incentive award paid to the named plaintiffs is not in the nature of a runner's or finder's fee for having brought the litigation to counsel. See In re Gould Sec. Litig., 727 F. Supp. 1201, 1209 (N.D. Ill. 1989) (explaining that "preferred treatment through an incentive award . . . borders on permitting a lay plaintiff to share in the attorneys' fees"); Model Rules of Prof'l Conduct r. 5.4(a) (Am. Bar Ass'n 2014) (general prohibition on division of fees with nonlawyers); Comm. on Prof'l Responsibility Ass'n of the Bar of the City of N.Y., Financial Arrangements in Class Actions, and the Code of Professional Responsibility, 20 Fordham Urb. L.J. 831, 838 (1993) ("Another possible danger is that in the hope of obtaining an incentive award, attorneys may be tempted to solicit named representatives and split the award with them.").

"carefully review" the request for fairness to other class members. See Varacallo v. Mass. Mut. Life Ins. Co., 226 F.R.D. 207, 257 (D.N.J. 2005).

The required review for class action incentive awards rests upon the "sensibl[e] fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." Hadix v. Johnson, 322 F.3d 895, 897 (6th Cir. 2003). As such, "incentive awards will not be freely distributed without a substantial basis to demonstrate that the individual provided services for the Class and incurred risks during the course of the litigation." Varacallo, 226 F.R.D. at 258.

To determine whether a proposed incentive award is proper, some courts have considered factors such as (1) "the risk to the plaintiff in commencing litigation, both financially and otherwise"; (2) "the notoriety and/or personal difficulties encountered by the representative plaintiff"; (3) "the extent of the plaintiff's personal involvement in the lawsuit in terms of discovery responsibilities and/or testimony at depositions or trial"; (4) "the duration of the litigation"; and (5) "the plaintiff's personal benefit (or lack thereof) purely in her capacity as a member of the class." McGee, 2014 WL 2514582, at *3. Each will be addressed in turn.

First, the risk factor does not clearly support
approval of the requested incentive award. On the one hand, the
Named Plaintiffs are not current employees of Defendant, so the
risks associated with speaking out against a current employer
are not present. See Montgomery v. Aetna Plywood, Inc., 231 F.3d
399, 410 (7th Cir. 2000) (affirming district court's denial of
an incentive award to the named plaintiff where "as a former
employee," he did not suffer or risk retaliation by defendant).
On the other hand, Plaintiffs may contend that the Named
Plaintiffs "risk their good will and job security in the
industry" more broadly and thereby risk their employment
prospects "for the benefit of the class as a whole." Bredbenner
v. Liberty Travel, Inc., Nos. 09-905, 09-1248, 09-4587, 2011 WL
1344745, at *23 (D.N.J. Apr. 8, 2011); see Hr'g Tr. 30:2-31:10,
ECF No. 25. But Plaintiffs do not factually support such an
argument. Therefore, on balance, this factor is neutral.

Second, there is no indication that the Named
Plaintiffs experienced any notoriety and/or personal
difficulties. Therefore, this factor does not favor a high
incentive award.

Third, the Court considers the extent of the Named
Plaintiffs' personal involvement in the lawsuit in terms of
discovery responsibilities and/or testimony at depositions or
trial. Here, class counsel states that the Named Plaintiffs

48

produced documents to describe and confirm their claims, assisted with case document review, spoke with putative class members about cooperating with the case's prosecution, reviewed pleadings for accuracy, assisted in preparing for settlement negotiations, and aided in the analysis of discovery materials. Pls.' Suppl. Mem. 2, ECF No. 22. But the Court cannot award the requested incentive award based on counsel's "vague statements" that the Named Plaintiffs provided run-of-the-mill assistance. Creed v. Benco Dental Supply Co., No. 12-1571, 2013 WL 5276109, at *7 (M.D. Pa. Sept. 17, 2013).

Rather, the incentive award must be "related to the personal risk incurred by the individual or any additional effort expended by the individual for the benefit of the lawsuit." Parker v. Time Warner Entm't Co., 631 F. Supp. 2d 242, 279 (E.D.N.Y. 2009). Indeed, disproportionately large incentive awards are often reduced to correspond to the amount of work actually performed. See, e.g., Romero v. La Revise Assocs., 58 F. Supp. 3d 411, 422 (S.D.N.Y. 2014) (reducing incentive award from $10,000 to $5,000 in part because the named plaintiff was not deposed and did not attend the mediation or any court proceedings); Khanna v. Intercon Sec. Sys., Inc., No. 09-2214, 2014 WL 1379861, at *11 (E.D. Ca. Apr. 8, 2014) (reducing incentive award from $10,000 to $2,500 in part because named

49

plaintiff did not spend more time assisting counsel than in the average case).

Here, there is no indication that the Named Plaintiffs were deposed, attended any settlement negotiations or court proceedings (other than one Named Plaintiff's appearance at the final fairness hearing), publicly disclosed information to further the claims, or expended any other resources to advance the case. Therefore, this factor does not support approval of the incentive award in the amount requested.

Fourth, the Court considers the duration of the litigation. Here, the Named Plaintiffs have been involved with the proceedings since their inception approximately one and one-half years ago on December 11, 2014. See ECF No. 1. Given the limited life span of the case, this factor only slightly favors approval.

Fifth and finally, the Court assesses the Named Plaintiffs' personal benefit purely in their capacity as class/collective members. Here, the Named Plaintiffs' shares as members of the class and collective entitle each of them to recover $1,410.80, which Class Counsel states is "half as much as the largest payments resulting from the settlement." Pls.'s Suppl. Mem. 2. The proposed incentive award would then provide each Named Plaintiff with an additional $4,000. Settlement ¶ 31.

Therefore, each Named Plaintiff would stand to recover $5,410.80 in total.[13]

In contrast, the other members of the class and collective could recover between $352.70 to $2,821.60. Pls.'s Mem. 22. As such, each Named Plaintiff would recover 52% more than those class or collective members who are entitled the largest amount available per individual under the Settlement Agreement. Based on the circumstances of this litigation, the Court finds that the requested enhancement is unwarranted.

A rubber-stamped approval by the Court of an unjustified incentive award is fodder for abuse. As one court has recognized, "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." Weseley v. Spear, Leeds & Kellogg, 711 F.Supp. 713, 720 (E.D.N.Y. 1989); see also Women's Comm. for Equal Emp't Opportunity v. Nat'l Broad. Co., 76 F.R.D. 173, 180 (S.D.N.Y. 1977) ("[W]hen representative plaintiffs make what

---

[13]        The Court notes that total class distribution amount will increase in light of the reduction in awarded attorneys' fees. See Settlement Agreement ¶¶ 31, 32. However, for purposes of judicial approval, the Court's review focuses on the parties' proposed distribution as delineated in the settlement agreement and not the revised figures.

amounts to a separate peace with defendants, grave problems of
collusion are raised.").

Indeed, Congress has expressed concern with the
potential abuse of incentive awards. See, e.g., Class Action
Fairness Act of 2005, Pub. L. No. 109-2, § 2(a)(3)(B), 119 Stat.
4, 4 ("Class members often receive little or no benefit from
class actions, and are sometimes harmed, such as
where . . . unjustified awards are made to certain plaintiffs at
the expense of other class members."). In fact, some statutes
have limited the amount of recovery available to a named
plaintiff beyond his or her share of the class damages. See,
e.g., 15 U.S.C. § 1692k(a)(2)(A), (a)(2)(B)(i) (named plaintiff
under the Federal Debt Collection Practices Act can recover no
more than $1,000 in addition to his or her share of the class
damages); see also Private Securities Litigation Reform Act of
1995 § 27(a)(4), 15 U.S.C. § 78u-4(a)(4) ("The share of any
final judgment or of any settlement that is awarded to a
representative party serving on behalf of a class shall be
equal, on a per share basis, to the portion of the final
judgment or settlement awarded to all other members of the
class.").

Moreover, substantial compensation to named plaintiffs
above and beyond the amount recovered by class members risks
modifying the substantive law under which the class action

arises. For example, although commonly permitted by courts,
"[n]o provision of rule or statute authorizes incentive awards
in collective actions." Espenscheid v. DirectSat USA, LLC, 688
F.3d 872, 877 (7th Cir. 2012). Congress selected particular
enforcement mechanisms for the FLSA, see 29 U.S.C. § 216(a)-(c),
which do not include any incentive scheme like those that were
historically present in qui tam or bounty hunter suits. See,
e.g., U.S. ex rel. The Saint Regis Mohawk Tribe v. President
R.C.--St. Regis Mgmt. Co., 451 F.3d 44, 53 (2d Cir. 2006)
(discussing incentive framework common to qui tam and bounty
hunter suits). Accordingly, "courts must be careful not to
second guess Congress' selection through incentive awards,
thereby illegitimately transforming the underlying substantive
law from a compensatory model to a bounty hunter model." Robles
v. Brake Masters Sys., Inc., No. 10-0135, 2011 WL 9717448, at
*17 (D.N.M. Jan. 31, 2011) (denying requested incentive award
for named plaintiffs in FLSA collective action settlement).

    Balancing these policies and concerns, the Court
believes that the Named Plaintiffs should receive some incentive
award for their assistance to Class Counsel and their
willingness to step forward as class representatives in this
case. But their involvement was both general and limited, and
they have not identified any specific risks that they faced in
their role. Therefore, the Court will reduce the requested

incentive award to $1,410.80. This amount, when combined with the Named Plaintiffs' personal recovery under the Settlement Agreement ($1,410.80), equals $2,821.60 in total recovery for each Named Plaintiff and matches the largest amount that any single individual class or collective member would stand to recover under the proposed Settlement Agreement.[14] See Pls.'s Mem. 22 (explaining that a class/collective member could recover up to $2,821.60 under the settlement's share division framework). The difference between the requested amount and awarded amount will return to the total class distribution fund. Settlement Agreement ¶ 31.

## IV.   CONCLUSION

For the foregoing reasons, the Court will certify the state law class and FSLA collective and approve the terms of the class/collective action Settlement Agreement as fair and reasonable.

The Court will approve $57,667 as attorneys' fees and $2,000 in out-of-pocket costs to be paid to class counsel. The difference between the requested attorneys' fees and awarded attorneys' fees ($22,333) is returned to the class distribution amount pursuant to the parties' agreement.

The Court will approve $1,410.80 as an incentive award to each of the two Named Plaintiffs. The difference ($5,178.40)

---

[14]        See supra n.13.

between the total requested incentive amount and the awarded incentive amount is returned to the class/collective distribution amount pursuant to the parties' agreement.

Class counsel shall submit an appendix to the Settlement Agreement for judicial approval consistent with this memorandum. The appendix shall reflect the enlarged share, ECF No. 21-3 ¶¶ 4, 31-32, to be distributed to the class/collective members due to the reduction in attorneys' fees and incentive award.

An appropriate order follows.